ESTATE OF MORRIS W. SHAPIRO, DECEASED, JEANNE A. SHAPIRO and SAMUEL SHAPIRO, PERSONAL REPRESENTATIVES and JEANNE A. SHAPIRO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Shapiro v. Commissioner
Docket No. 21705-81.
United States Tax Court
T.C. Memo 1987-126; 1987 Tax Ct. Memo LEXIS 121; 53 T.C.M. (CCH) 317; T.C.M. (RIA) 87126; March 10, 1987. *121 In 1972, P, the majority shareholder in L Corp., exchanged all of his shares in L Corp. for shares in D Corp. After such exchange, an account receivable due from P to L Corp. was carried over on the books of D Corp. D Corp. never attempted to collect such account. P received a salary from D Corp. and was financially solvent. In 1976, D Corp. wrote off the account receivable as uncollectible. Held: (1) The writeoff by D Corp. resulted in cancellation of the debt represented by P's account and resulted in income to P. (2) P is not liable for the addition to tax for negligence under sec. 6653(a), I.R.C. 1954. *122 Edward DeFranceschi, for the petitioners. Mae J. Lew, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $5,165.28 in the petitioners' Federal income tax for 1976 and an addition to tax of $258.26 under section 6653(a) of the Internal Revenue Code of 1954. [1] The issues for decision are: (1) Whether the petitioners received *123 income in 1976 when an account receivable due from them was written off as uncollectible; and (2) whether the petitioners are liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Morris and Jeanne Shapiro, husband and wife, resided in Lexington, Massachusetts, at the time the petition in this case was filed. They filed their joint Federal income tax return for 1976 with the Internal Revenue Service Center, Andover, Massachusetts. Petitioner Morris Shapiro, M.D. (Morris), died on April 4, 1983. Jeanne Shapiro and Samuel Shapiro (Samuel) were appointed the personal representatives of the Estate of Morris Shapiro. Thereafter, this Court granted a motion to substitute the estate for Morris Shapiro as a petitioner. Samuel was the brother of Morris and was his accountant and financial advisor. He has been a certified public accountant since 1950 and was the clerk, accountant, and financial advisor *124 for Laboratory Enterprises, Inc. (LEI), until July 1972. He played an active role in negotiations regarding the transactions involved in this case and read and executed all of the documents relevant to such transactions. In addition, he has dealt with numerous corporate reorganizations. On July 21, 1972, Morris, individually and as a trustee, owned 98.6 percent, and Samuel owned 1.4 percent, of the common stock of LEI. [2] On such date, Morris and Samuel exchanged their common stock in LEI for common stock in Damon Corporation (Damon). [3] Morris received 16,120 shares of Damon stock, and Samuel, individually and as a trustee, [4] received 3,880 shares. Out of such shares of Damon, Morris delivered 3,224 shares, and Samuel delivered 776 shares, to an escrow agent. Morris and Samuel agreed not to transfer more than 10,000 shares of stock within the first year nor more than 15,000 shares within the second year following the reorganization. They also agreed to pay any tax deficiency of LEI for a pre-reorganization year which might subsequently be assessed. *125 The reorganization was a Type B reorganization, as defined by section 368(a)(1)(B)[5]; it was intended to be a stock-for-stock transaction without any further financial arrangements for the benefit of Morris or Samuel. Specifically, the warranty and indemnity agreement stated: Neither the execution and delivery of the Plan and Agreement of Reorganization, nor consummation of the transactions contemplated hereby, will (i) result in the acceleration of, or the creation in any party of the right to accelerate, terminate, modify or cancel, any indenture, contract, lease, sublease, loan agreement, note or other obligation or liability to which the Corporation [LEI] is a party or by which it is bound or to which its assets are subject * * * Before the reorganization, there was in the records of LEI an LEI account receivable from Morris (the Morris account) in the amount of $30,827, representing Morris' draw from LEI over and above the amount he was entitled to as salary; after the reorganization, such account was recorded as an account receivable by Damon. *126 Under a management and service agreement, executed on July 21, 1972, as part of the reorganization, Morris and his partner, Dr. C. Lewis Long, agreed to supervise and control all aspects of the clinical operations of the laboratory of Damon. Damon also agreed to furnish the doctors with certain administrative and financial services in return for a fee. The plan and agreement of reorganization stated: 8. All representations, warranties, agreements and other inducements to this Plan and Agreement of Reorganization or the transactions contemplated hereby, whether oral or written, prior to the execution and delivery hereof, have been included herein or in the Agreements, and shall be deemed to have been fully performed and discharged to the extent not included herein or therein, and without limitation of the foregoing generality, there shall be no obligation on the part of Damon or the Corporation [LEI] to pay to the Stockholders or anyone else at any time or for any reason any commission, share of profits, interest or equity in any property, asset or business, or any other compensation, or to conduct, or to continue to conduct hereafter, any business at any particular location *127 or in any particular manner or way or at all. This Plan and Agreement of Reorganization and the Agreements set forth all rights, remedies, obligations and liabilities of the parties, and no terms and provisions hereof or thereof, including without limitation the terms and provisions contained in this sentence, shall be waived, modified or altered so as to impose any additional obligations or liability or grant any additional right or remedy, and no custom, payment, act, knowledge, extension of time, favor or indulgence, gratuitous or otherwise, or words or silence at any time, shall impose any additional obligation or liability or grant any additional right or remedy, or be deemed a waiver or release of any obligation, liability, right or remedy except as set forth in a written instrument properly executed and delivered by the party sought to be charged, expressly stating that it is, and to the extent to which it is, intended to be so effective. * * * On August 31, 1976, Damon "wrote off" seven accounts, totaling approximately $241,700.00, as uncollectible. One such account was the Morris account with a balance of $37,413.49. Such balance was comprised of approximately $11,268.00, *128 which arose from payments made by Damon for income tax deficiencies of LEI for pre-reorganization years, and approximately $26,145.00, [6] which represented the unpaid portion of the Morris account as carried over from LEI. In connection with the "year end write off list," a memorandum by the controller of Damon stated in part: "Dr. Shapiro's account has been on the books for a number of years and therefore it may be concluded that it will not be paid." "With the exception of Dr. Shapiro's receivable, attempts have been or are being made to collect the above accounts thru our Corporate legal department, * * * or our outside collection service. * * * Collection action will continue through legal subsequent to write off." As of the date of the writeoff, no attempt had been made to collect the Morris account; the escrow agent held at least 2,000 of the shares of Damon stock delivered by Morris and Samuel; and Morris was solvent and earning $32,004.00 a year from Damon. As a result of the writeoffs, Damon reported a bad debt deduction, including $37,413.49 for the Morris account, on its Federal income tax return for its fiscal year ending in 1976. *129 In early 1979, Damon's corporate Federal income tax return for its fiscal year ending in 1976 was examined by the IRS. The examining revenue agent proposed to disallow Damon's deduction based on its writeoff of the Morris account. A Damon memorandum dated March 26, 1979, from George Anastos, Damon's tax manager, to Allan Beitchman, Damon's chief financial officer, stated that: On the basis of information currently available, there is no apparent way to support a bad debt write-off for this amount in fiscal 76 since the ability of Dr. Shapiro to pay the debt seems existent. In order to support a deduction it would seem the most appropriate solution would be to treat the item as compensation. However, in presenting this response to the agent, his obvious reply will be to ask if a [Form] 1099 was given to the Doctor for this conscious forgiveness. Prior to discussing this issue (and other bad debt issues) at length with the agent it is necessary to know if the company would be inclined to follow through regarding transmittal of a [Form] 1099 to the Doctor (in the event it is suggested by the agent), or alternatively if it is decided to obtain collection of the receivable. * *130 * * Mr. Beitchman determined that, if necessary, a Form 1099 for $26,145 would be sent to Morris. There is no evidence that such form was sent, and Morris never reported such forgiveness as income. Damon conceded to the IRS that approximately $11,268 associated with LEI's prereorganization tax deficiencies was not allowable as it could be satisfied out of shares held in escrow. On April 30, 1979, Damon, Morris, and Samuel executed a document directing the First National Bank of Boston to release from escrow the remaining 2,000 shares of stock and to issue a new stock certificate for such shares in the name of Damon. On May 31, 1979, in return for such shares, Damon executed the following release: For good and valuable consideration the undersigned Damon Corporation and Damon Medical Laboratory hereby release and discharge Morris Shapiro, M.D., Samuel Shapiro individually and as Trustee, their heirs, executors, administrators, successors and assigns, or any partnership of which they are or were partners from all demands, actions, causes of action, suits, damages and any and all claims and liabilities that the undersigned now have or ever had against any of the foregoing for, *131 upon or by reason of any matter whatsover. In his notice of deficiency, the Commissioner determined that the petitioners received $26,145 of income from Damon in 1976 as a result of forgiveness of the unpaid portion of the Morris account. In addition, the Commissioner determined that, as a result of failing to report such income, the petitioners were liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. OPINION The first issue for decision is whether the petitioners received income in 1976 when the Morris account was written off as uncollectible by Damon. The petitioners bear the burden of proof concerning such issue. Rule 142(a), Tax Court Rules of Practice and Procedure.[7] The petitioners argue that the debt was forgiven at the time of the reorganization in 1972 or in 1979 when the shares held in escrow were transferred to Damon and the release of Morris was executed by Damon. It is well settled that gross income includes income from the discharge of indebtedness. *132 Sec. 61(a)(12). A corporation's cancellation of a shareholder's fully collectible indebtedness may be a constructive dividend to the shareholder or the payment of compensation, either of which is includable in gross income. Sec. 61(a)(7); sec. 1.61-12(a), Income Tax Regs.; Shephard v. Commissioner,340 F.2d 27 (6th Cir. 1965), affg. a Memorandum Opinion of this Court. The general theory is that to the extent a taxpayer has been released from indebtedness, he has realized an accession to income because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness. United States v. Kirby Lumber Co.,284 U.S. 1 (1931). Whether a debt has been discharged is dependent on the substance of the transactions. Mere formalisms arranged by the parties are not binding in the application of the tax laws. Commissioner v. Court Holding Co.,324 U.S. 331 (1945). Consequently, bookkeeping entries are not conclusive but can be considered along with other available evidence in determining whether income has resulted from cancellation of an indebtedness. *133 Callan Court Co. v. Commissioner,T.C. Memo. 1965-261. The first argument for consideration is that the Morris account was canceled by Damon in 1972 as part of the reorganization. Because the objective evidence does not support this argument, the petitioners have failed to meet their burden of proof. Samuel testified that he was under the belief that the Morris account was canceled at the time of the reorganization and that such cancellation of the debt resulted in a reduction of Morris' basis in his Damon shares. Such basis would otherwise have been the same as Morris' basis in his LEI shares, but Samuel believed that under section 108, Morris could exclude the income from the discharge of his debt and reduce his basis in the stock. He supported this testimony with certain notes which he claimed were made during reorganization negotiations. In 1972, such section provided an exclusion from gross income, at the taxpayer's election, of the amount of income attributable to the discharge of indebtedness incurred or assumed either by a corporation or by an individual in connection with property used in his trade or business. [8] Despite Samuel's experience with reorganizations, *134 he was in error, as the petitioners now admit in believing that section 108 was applicable. The petitioners provide no explanation for Samuel's error; however, we observe that the record contains no evidence that the Morris account was indebtedness incurred in connection with property used in a trade or business. In addition, although Samuel read and signed all the relevant reorganization documents, the petitioners have not identified any document that supports his understanding. In fact, the warranty and indemnity agreement for which Samuel prepared an exhibit listing the Morris account as an asset, stated that the reorganization would not result in the modification of any liability to which LEI was a party. The absence of documentary support for Samuel's understanding is especially significant by virtue of the integration clause in the plan and agreement of reorganization, which requires all the terms of the reorganization to be in writing. Moreover, Damon treated the Morris account as an asset until 1976. Finally, Vernon Sherman, the assistant treasurer of Damon in 1972 and a Damon *135 representative at the reorganization negotiations, did not recall any discussion concerning debt forgiveness. These circumstances lead us to conclude that there was no intention to forgive the Morris account at the time of the reorganization. The second argument for consideration is that the Morris account was canceled in 1979 when, following the transfer to Damon of the shares held in escrow, Damon executed a release of Morris. The petitioners state that if the debt represented by the Morris account was not canceled in 1972, it continued in effect until 1979 and was not affected by the Damon writeoff in 1976. In support of this argument, they note that, in 1976, Morris was solvent and shares were held in escrow; thus, the debt was not worthless, and collection efforts were to continue on all receivables written off in 1976. Furthermore, the petitioners point out that when the IRS disallowed such writeoff, part of the debt was collected through the transfer of the stock held in escrow, and Morris was given a general release from liability. On the other hand, the Commissioner claims that, in 1976, the decision to write off the Morris account was made by the management of Damon *136 based on their belief at the time that it was uncollectible or that for business reasons, no effort would be made to collect it. The Commissioner determined that, in 1976, the decision was made never to collect the Morris account. The record contains persuasive evidence supporting that determination, and the petitioners have failed to produce sufficient credible evidence to refute the Commissioner's determination. Damon's writeoff of the seven debts, including the Morris account, in 1976 did not, in and of itself, reveal an intention to cancel such debts, but that act, together with other evidence, shows indisputably that the management of Damon had no intention to attempt to collect the Morris account. Although the memorandum stated that "Collection action will continue * * *," the memorandum expressly recognized that no attempts were being made to collect the Morris account, and no effort had been made to collect that account before the IRS raised an issue concerning the writeoff in 1979. Moreover, Morris was employed at Damon earning $32,004.00 per year, and as part of the reorganization agreement, an escrow agent held several thousand of his Damon shares. These circumstances *137 make clear that, for whatever reason, Damon intended in 1976 not to collect the Morris account. Our conclusion is supported by the response of Damon to the proposed IRS disallowance of the bad debt deduction for the writeoff of the Morris account. Such writeoff was for $37,413.49, approximately $11,268.00 of which arose from the pre-reorganization tax deficiencies of LEI and approximately $26,145.00 of which arose from the Morris account as carried over from LEI. Mr. Beitchman determined that, if necessary, a Form 1099 for $26,145.00 would be sent to Morris, rather than attempt to obtain collection of such amount. At the same time, Damon conceded that $11,268.00 of such bad debt deduction was not allowable because it could be satisfied out of the Damon shares held in escrow. These actions indicate that Damon clearly recognized that the amount in issue, $26,145.00, was forgiven debt. We find that the petitioners have failed to prove that the release executed by Damon in 1979 had the significance claimed by them. We have been presented with no evidence concerning the value of the Damon stock at that time, and we have no evidence as to the terms of the agreement leading to that *138 release. The evidence that we do have as to the communications between the officials of Damon at the time suggest that the Damon stock held in escrow may have been transferred in satisfaction of Damon's claim for deficiencies in tax incurred by LEI. There has been no showing that such transfer had anything to do with the amount at issue, the $26,145 carried over from the withdrawal account that Morris had with LEI. In fact, the evidence tends to confirm our conclusion that such amount was forgiven in 1976. The final issue remaining for decision is whether the petitioners are liable for the addition to tax under section 6653(a). Such section provides for an addition to tax where an underpayment of tax is due to negligence or intentional disregard of rules and regulations. See Richardson v. Commissioner,72 T.C. 818 (1979). The petitioners bear the burden of proving that they are not liable for such addition to tax. Rule 142(a); Luman v. Commissioner,79 T.C. 846, 860-861 (1982). Morris retained his brother Samuel as his tax advisor and accountant. Samuel was a CPA with over 20 years' experience, including substantial experience in the area *139 of corporate reorganizations, when the reorganization occurred in 1972. Samuel believed that the Morris account was canceled at the time of such reorganization and that such cancellation would produce no income but a reduction of Morris' basis in his Damon shares. Samuel's advice was wrong; however, Morris did seek experienced professional assistance to handle a sophisticated transaction. Additionally, there is nothing in the record to indicate that the petitioners had any knowledge of or reason to know about Damon's writeoff in 1976. Therefore, on the facts of this case, we conclude that the petitioners are not liable for the addition to tax. Decision will be entered for the respondent as to the deficiencies and for the petitioners as to the addition to tax.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in question.↩
2. Although the record is not clear on these points, Morris apparently was a pathologist and LEI was a clinical testing laboratory. ↩
3. The functions of LEI were combined with Damon Medical Laboratory, a wholly owned subsidiary of Damon Corporation. For convenience, Damon will refer to Damon Corporation and all its subsidiaries. ↩
4. In describing the ownership of LEI, the parties stipulated that Morris held some shares as trustee. However, in the reorganization and the escrow agreement, Samuel acquired and transferred into escrow some shares of Damon as trustee. There is no explanation in the record of this apparent discrepancy, but it is immaterial for our purposes.↩
5. See B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.13 (4th ed. 1979).↩
6. Such amount is less than the balance of the Morris account as carried over from LEI. Although the record is not entirely clear on this point, the decrease appears to have resulted from Morris actually accepting less compensation than that to which he was entitled in the post-reorganization years.↩
7. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
8. This provision is not included in section 108 of the Internal Revenue Code of 1986↩.